**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | |
|---|---|
| MELVA KENNEDY, ADAM SAGER, PEGGY RAINBOW, JAMES RATCLIFFE, MARYANN WHITE, CURTIS HANSON, AND WILMA GILLESPIE, individually and on behalf of all others similarly situated, <br><br> *Plaintiffs,* <br><br> -*vs*- <br><br> 3M COMPANY, <br><br> *Defendant.* | **Civ No.** 3:25-cv-04833-RMG <br><br> **CLASS ACTION COMPLAINT** <br><br> **Jury Trial Demanded** |

   Plaintiffs ADAM SAGER, PEGGY RAINBOW, JAMES RATCLIFFE, MELVA KENNEDY, MARYANN WHITE, CURTIS HANSON, AND WILLMA GILLESPIE, (collectively "Proposed Class Representatives"), by and through their attorneys Richard A. Harpootlian, P.A., Trammell PC and Bailey Cowan Heckaman PLLC (collectively "Proposed Class Counsel"), for their Class Action Complaint against Defendant 3M Company ("Defendant" or "3M") allege on behalf of themselves, and others similarly situated as follows:

## INTRODUCTION AND BACKGROUND

1.     The Proposed Class Representatives are users of drinking water supplied by United States municipal public water systems ("Public Water Systems") who bring this class action lawsuit on behalf of themselves and other similarly situated users of drinking water supplied by Public Water Systems (the "Proposed Class Members") arising from the widespread contamination of water intended for distribution to consumers and users with per- and polyfluoroalkyl substances ("PFAS"), a family of chemical compounds that includes perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS").

2.     Collectively, the Proposed Class Representatives and Proposed Class Members use and consume drinking water supplied by Public Water Systems. The Public Water System's drinking water supplies have been contaminated with PFAS.  The Proposed Class Representatives seek to represent all similarly situated users of drinking water supplied by Public Water Systems.

3.     At various times from the 1940s through 2002, Defendant 3M developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used PFAS alone or in end products manufactured with or containing PFAS (collectively referred to as "Defendant's PFAS").  Defendant's PFAS were used in products, such as aqueous film-forming foam ("AFFF"), Teflon, Scotchgard products, such as soil, oil and water repellent products, coatings used for oil and grease resistance on paper packaging, and specialty components for other products.

4.     Defendant's PFAS are manufactured compounds that are toxic and bioaccumulative and do not biodegrade, thus, causing them to persist in the environment, move readily through soil and groundwater, and pose a significant risk to human health and safety.

5.     Defendant developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used Defendant's PFAS with the knowledge that these toxic

compounds would be released into the environment when used as directed, instructed and/or intended.

6.     As far back as 1979, if not earlier, Defendant 3M was aware that Defendant's PFAS would be and have been used, released, stored, and/or disposed of at, near or within the vicinity of the drinking water supplies of the Proposed Class Representatives and Proposed Class Members, and that they would enter the environment, migrate through the soil, sediment, stormwater, surface water, and groundwater, thereby contaminating or threatening to contaminate the drinking water supplies of the Proposed Class Representatives and Proposed Class Members.

7.     Nevertheless, Defendant elected to develop, manufacture, formulate, distribute, sell, transport, store, load, mix, apply and/or use Defendant's PFAS, thereby placing profits over human health and the environment.

8.     At all relevant times, beginning decades ago and continuing until 2002, Defendant's PFAS were developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied, used and/or disposed of in the vicinity of the drinking water supplies of the Proposed Class Representatives and Proposed Class Members.

9.     During these activities, and at all relevant times, Defendant's PFAS were being applied, used and/or disposed of as directed, instructed and/or intended by the manufacturers, which allowed PFAS to enter the environment. When applied, used and/or disposed of as directed, instructed and/or intended by the manufacturers, these compounds migrated through the soil and into the groundwater, thereby contaminating the drinking water supplies of the Proposed Class Representatives and Proposed Class Members.

10.     One product Defendant manufactured was AFFF, which is a firefighting agent used for training and to control and extinguish Class B fuel fires, that was distributed, and/or sold at military and civilian airports and to municipal fire departments throughout the United States.

11.     Regarding AFFF specifically, Defendant developed, manufactured, formulated, distributed, and/or sold Defendant's PFAS-containing AFFF for use by its customers with the knowledge that toxic compounds would be released into the environment during fire protection, training, and response activities even when the AFFF was used as directed, instructed and/or intended by the manufacturers.

12.     Further, regarding AFFF specifically, Defendant developed, manufactured, formulated, distributed, and/or sold Defendant's PFAS-containing AFFF with the knowledge that large quantities of PFAS would be stored, used, and/or maintained in a manner such that these toxic chemicals would be released into the environment and contaminate the air, soil, and groundwater.

13.     At all relevant times, beginning decades ago and, continuing to approximately 2015, Defendant's PFAS-containing AFFF was used and stored at fire training facilities, fire departments, airports, and military bases for fire protection, training, and response activities. During these activities, Defendant's PFAS-containing AFFF was used as directed, instructed and intended by Defendant 3M, which allowed PFAS to enter the environment and leach into the air, soil, and groundwater, thereby contaminating the drinking water supplies of the Proposed Class Representatives and Proposed Class Members.

14.     As a result of their exposure to Defendant's PFAS that were applied, used and/or disposed of as directed, instructed and/or intended by Defendant 3M, numerous discrete PFAS chemicals have been detected in Public Water Systems' drinking water supplies at substantial levels and/or are threatened with such detection.

15.     The Proposed Class Representatives bring this action, individually and on behalf of all others similarly situated, against Defendant to recover any and all relief with respect to the

decades-long and ongoing contamination of their water supply created by Defendant's PFAS, as well as any and all punitive damages available as a result of the actions and/or inactions of Defendant, and to ensure that Defendant, as the responsible party, bears such expense, rather than the Proposed Class Representatives and Proposed Class Members.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332 (d) because there is minimal diversity of citizenship among the parties, there are more than one hundred members of the proposed Class, and the amount in controversy exceeds the sum or value of $5,000,000.00 exclusive of interest and costs.

17.     Venue is appropriate in the Columbia Division of this District under 28 U.S.C. § 1391(b)(2) because putative class member Melva Kennedy is a resident of Columbia, South Carolina, and her claims arose from acts or omissions occurring in Columbia, South Carolina.

## PARTIES

**A.     Proposed Class Representatives for the Proposed Class**

18.     **Plaintiff  Adam Sager** is a resident of North Carolina and a user of drinking water supplied by Greensboro, North Carolina's Public Water System.  The drinking water supplied by Greensboro, North Carolina's Public Water System is contaminated with Defendant's PFAS.

19.     **Plaintiff Peggy Rainbow** is a resident of Wisconsin and a user of drinking water supplied by Madison, Wisconsin's Public Water System. The drinking water supplied by Madison, Wisconsin's Public Water System is contaminated with Defendant's PFAS.

20.     **Plaintiff James Ratcliffe** is a resident of Virginia and a user of drinking water supplied by Roanoke, Virginia's Public Water System. The drinking water supplied by Roanoke, Virginia's Public Water System is contaminated with Defendant's PFAS.

21.     **Plaintiff Melva Kennedy** is a resident of South Carolina and a user of drinking water supplied by Columbia, South Carolina's Public Water System. The drinking water supplied by Columbia, South Carolina's Public Water System is contaminated with Defendant's PFAS.

22.     **Plaintiff MaryAnn White** is a resident of Ohio and a user of drinking water supplied by Cincinnati, Ohio's Public Water System. The drinking water supplied by Cincinnati, Ohio's Public Water System is contaminated with Defendant's PFAS.

23.     **Plaintiff Curtis Hanson** is a resident of New Hampshire and a user of drinking water supplied by Portsmouth, New Hampshire's Public Water System. The drinking water supplied by Portsmouth, New Hampshire's Public Water System is contaminated with Defendant's PFAS.

24.     **Plaintiff Wilma Gillespie** is a resident of Illinois and a user of drinking water supplied by East St. Louis, Illinois' Public Water System. The drinking water supplied by East St. Louis, Illinois' Public Water System is contaminated with Defendant's PFAS.

**B.      Party Defendant**

25.     **Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M")** is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144.

26.     At all relevant times, Defendant 3M manufactured, marketed, promoted, distributed, and/or sold PFAS-containing products, such as AFFF, throughout the country.

27.     3M is the only company that manufactured and/or sold AFFF containing PFOS. 3M also manufactured and/or sold AFFF containing PFOA.

28.     At various times from the 1940s through 2002, Defendant 3M developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or

used Defendant's PFAS. Defendant's PFAS were later stored, handled, used, discharged, and/or disposed of at sites in the vicinity of the drinking water supplies of the Proposed Class Representatives and Proposed Class Members.

29.     Defendant's PFAS-containing products continued to be used until approximately 2015, and Defendant 3M was aware of such, even after it stopped developing, manufacturing, formulating, distributing, selling, transporting, storing, loading, mixing, applying and/or using Defendant's PFAS.

30.     The Proposed Class Representatives, individually and on behalf of similarly situated users of drinking water supplied by Public Water Systems seek damages against Defendant 3M as set forth herein relating to their exposure to Defendant's PFAS.

## GENERAL FACTUAL ALLEGATIONS

### A.  THE CONTAMINANT: PFAS

31.     PFAS is a family of chemical compounds that include PFOA and PFOS and many other compounds.

32.     PFOA and PFOS are within a class of chemicals known as perfluoroalkyl acids ("PFAAs"). PFAAs are part of a larger chemical family known as PFAS.

33.     PFAAs are composed of a chain of carbon atoms in which all but one of the carbon atoms are bonded to fluorine atoms, and the last carbon atom is attached to a functional group. The carbon-fluorine bond is one of the strongest chemical bonds that occur in nature which is why these molecules are so persistent and bioaccumulate.

34.     PFAAs are sometimes described as long-chain and short-chain, depending on the number of carbon atoms contained in the carbon chain. PFOS and PFOA are considered long-chain PFAAs because they have eight carbon atoms in their chain.

35.     PFOS and PFOA do not occur in nature. Rather, they are stable, man-made

7

chemicals. They are highly water soluble, persistent in the environment and resistant to biologic, environmental, or photochemical degradation. Because these compounds are water soluble and do not readily adsorb to sediments or soil, they tend to stay in the water column and can be transported long distances.

36.    PFOS and PFOA are readily absorbed in animal and human tissues after oral exposure and accumulate in the serum, kidney, and liver. They have been found globally in water, soil, and air as well as in human food supplies, breast milk, umbilical cord blood, and human blood serum.[1]

37.    PFOS and PFOA are persistent in the human body and resistant to metabolic degradation. A short-term exposure can result in a body burden that persists for years and can increase with additional exposures.[2]

38.    PFOS and PFOA are relatively stable once ingested, so they bioaccumulate in individual organisms for significant periods of time. Because of this stability, any newly ingested PFOS and/or PFOA will be added to any PFOS and/or PFOA already present. In humans, PFOS and/or PFOA remain in the body for years.

39.    Additionally, PFOS and PFOA biomagnify up the food chain. This occurs, for example, when humans eat fish that have ingested PFOS and/or PFOA.

---

[1] *See* Agency for Toxic Substances and Disease Registry, Per- and Polyfluoroalkyl Substances and Your Health, available at https://www.atsdr.cdc.gov/pfas/index.html (Last Accessed June 7, 2023)

[2] *See* EPA, Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA), EPA Document Number: 822-R16-005 (May 2016) at 55; Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS), EPA Document Number: 822-R-16-004 (May 2016) at 55, both available at https://www.epa.gov; Proposed PFAS National Primary Drinking Water Regulation FAQs for Drinking Water Primacy Agencies ("EPA determined that PFOA and PFOS are likely carcinogens (i.e., cancer causing) and that there is no level of these contaminants that is without a risk of adverse health effects."), available at https://www.epa.gov/system/files/documents/2023-03/FAQs_PFAS_States_NPDWR_Final_3.14.23_0.pdf. (Last Accessed June 7, 2023)

40.     Since they were first produced, information has emerged showing negative health effects caused by exposure to PFOS and PFOA, including but not limited to:

      a.  Altered growth, learning, and behavior of infants and older children;

      b.  Lowering a woman's chance of getting pregnant;

      c.  Interference with the body's natural hormones;

      d.  Increased cholesterol levels;

      e.  Modulation of the immune system;

      f.  Increased risk of certain cancers; and

      g.  Increased risk of ulcerative colitis.

41.     The EPA has warned that there is evidence that PFAS are likely carcinogens.[3]

42.     The EPA has noted that "drinking water can be an additional source [of PFOS and PFOA in the body] in the small percentage of communities where these chemicals have contaminated water supplies." In communities with contaminated water supplies, "such contamination is typically localized and associated with a specific facility, for example […] an airfield at which [PFOS or PFOA] were used for firefighting."[4]

43.     No federal or state agency has approved PFAS as additives to drinking water. No federal or state agency has approved releasing or discharging PFAS into groundwater.At all

_____

[3] *See* Proposed PFAS National Primary Drinking Water Regulation FAQs for Drinking Water Primacy Agencies (March 14, 2023) ("EPA determined that PFOA and PFOS are likely carcinogens (i.e., cancer causing) and that there is no level of these contaminants that is without a risk of adverse health effects."), available at https://www.epa.gov/system/files/documents/2023-03/FAQs_PFAS_States_NPDWR_Final_3.14.23_0.pdf. (Last Accessed June 7, 2023)

[4] *See* "Fact Sheet PFOA & PFOS Drinking Water Health Advisories," EPA Document Number: 800-F-16-003, available at https://www.epa.gov/sites/default/files/2016-06/documents/drinkingwaterhealthadvisories_pfoa_pfos_updated_5.31.16.pdf (Last Accessed June 7, 2023)

relevant times, Defendant developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used PFAS and/or in end products manufactured with or containing PFAS.

44. At all relevant times, Defendant's PFAS were used to make a variety of consumer and industrial goods sold, supplied, used, and disposed of throughout the United States. Defendant's PFAS were used, for example, in waterproofing waxes, stain-preventing coatings, and AFFF used for firefighting.

45. When applied, used and/or disposed of as directed, instructed and/or intended by Defendant 3M, Defendant's PFAS entered into the environment.

46. Once Defendant's PFAS were free in the environment, they did not hydrolyze, photolyze, or biodegrade under typical environmental conditions. Instead, they were and still are extremely persistent in the environment. As a result of their persistence, they are widely distributed throughout soil, air, and groundwater.

47. The application, use and/or disposal of Defendant's PFAS as directed, instructed and/or intended by the manufacturers allowed PFAS to enter into the water supplies of the Proposed Class Representatives and Proposed Class Members where these compounds migrated through the subsurface and into the groundwater, thereby contaminating the surface, soil, sediment and groundwater, as well as causing other extensive and ongoing damage to the water supplies of the Proposed Class Representatives and Proposed Class Members.

48. Due to the persistent nature of Defendant's PFAS, among other things, they have caused, and continue to cause, hazardous contamination of the water supplies of the Proposed Class Representatives and Proposed Class Members.

49. One product Defendant manufactured, developed and sold is AFFF. AFFF is a

water-based foam that was first developed in the 1960s to extinguish flammable liquid fuel fires at military bases, aircraft carrier locations, and airports, among other places. AFFF is typically sprayed directly onto a fire, where it then works by coating the ignited fuel source, preventing its contact with oxygen, and suppressing combustion.

50.     The vast majority of AFFF was used in training, which was an activity promoted by Defendant 3M.  When used as directed, instructed and/or intended, AFFF containing Defendant's PFAS released PFOS and PFOA into the environment.

51.     During these activities, AFFF containing Defendant's PFAS was used as directed, instructed and/or intended by the manufacturers, which allowed PFOS and PFOA to enter into the drinking water supplies of the Proposed Class Representatives and Proposed Class Members where these compounds migrated through the subsurface and into the groundwater, thereby contaminating the surface, soil, sediment and groundwater, as well as causing other extensive and ongoing damages.

52.     AFFF can be made without PFOA and/or PFOS.  Despite knowledge of this fact as well as knowledge of the toxic nature of AFFF made with Defendant's PFAS, Defendant continued to develop, manufacture, formulate, distribute, sell and/or transport Defendant's PFAS to be used in AFFF which led to the ongoing contamination and damages to the water supplies of the Proposed Class Representatives and Proposed Class Members.

53.     Due to the chemicals' persistent nature, among other things, these chemicals have, and continue to, cause injury and damage to the water supplies of the Proposed Class Representatives and Proposed Class Members.

54.     At all relevant times, Defendant was sophisticated and knowledgeable in the art and science of developing, manufacturing, formulating, distributing, selling, transporting, storing, loading, mixing, applying and/or using products containing Defendant's PFAS.  Defendant

11

understood far more about the properties of Defendant's PFAS—including the potential hazards they posed to human health and the environment—than any of their customers as well as the Proposed Class Representatives and Proposed Class Members. Nevertheless, Defendant declined to use their sophistication and knowledge to design safer products and/or warn their customers, the Proposed Class Representatives and Proposed Class Members, of the dangers associated with Defendant's PFAS.

55.     As a direct and proximate result of Defendant's acts and omissions, as alleged in this Class Action Complaint, the drinking water supplies of the Proposed Class Representatives and Proposed Class Members have been contaminated and will continue to be contaminated with PFOS and PFOA, thereby creating an environmental and public health hazard.

56.     Defendant breached its duty to evaluate and test Defendant's PFAS adequately and thoroughly to determine their environmental fate and transport characteristics and potential human health and environmental impacts before it sold such products. Defendant breached its duty to minimize the environmental harm caused by Defendant's PFAS. Moreover, Defendant failed to warn the Proposed Class Representatives and Proposed Class Members of the known risks for environmental and health hazards arising from the application, use and/or disposal of Defendant's PFAS when such products were being applied, used and/or disposed of as instructed, directed and/or intended.

**B.     DEFENDANT 3M'S USE OF PFAS AND ITS KNOWLEDGE OF THE DANGERS OF PFAS**

57.     3M began manufacturing PFAS in the 1940s and acquired the patent rights to the electrochemical fluorination ("ECF") process in 1950.

58.     Using this technology, 3M developed a new class of chemicals known as fluorocarbons, including fluorinated surfactants or fluorosurfactants.

59.     3M subsequently received patents for specific fluorocarbon compounds, including PFOA and PFOS, throughout the 1950s and 1960s.

60.     Despite the "amazingly unique surface properties" of these compounds, 3M struggled to find commercial applications for its fluorosurfactants. An article published in the March 1952 issue of POPULAR MECHANICS magazine, aptly titled – "WANTED – Jobs for a Trillion New Chemicals" – explained that although "it's theoretically possible to produce around a trillion fluorocarbon compounds," and that 3M had identified "possible uses" for fluorocarbons, the company had not yet found commercial uses for them.

61.     Lacking commercial applications for its fluorochemicals, 3M published a "series of trade advertisements that featured the surfactant technology and made specific reference to the unique properties obtainable with the fluorochemical molecule."

62.     In 3M's own document, entitled, "*The History of the Development of "Light Water" Brand Aqueous Film Forming Foam Concentrates*," this advertising campaign was described as follows:

> The ads appeared in chemical industry trade journals and were designed to attract the bench chemist. When a request for more information was received from one of these ads, the respondent was sent a questionnaire in which he was asked to define his problem. The returned questionnaire was then screened by a committee from the laboratory and Commercial Development Department, and certain surfactant samples were sent. These samples were intended to be tried in the customer's laboratory as the solution to his problem. The samples were given 'L' numbers so that their chemical structure would not be identified.

63.     3M's advertising campaign worked, and its PFAS has since been used in various products, including AFFF, Teflon, Scotchgard products, such as soil, oil and water repellent products, coatings used for oil and grease resistance on paper packaging, and specialty components for other products.

64.     Regarding AFFF specifically, in March 1962, E.J. Jablonski and Dr. Richard L. Tuve at the Naval Research Laboratories ("NRL") responded to one of 3M's advertisements, inquiring about materials that might aid in the development of a new type of fire-fighting foam – AFFF.

65.     Over the next few months, 3M sent several samples of its surfactant L-1083 (later redesignated FX172), labeled as such to keep the chemical composition secret from NRL, and visited NRL at least twice to discuss their fluorosurfactant properties and to review testing results.

66.     3M also began working with another company, Ansul Company, to develop an effective AFFF dispensing system for the Navy.

67.     In 1963, 3M created its first successful AFFF formulation FX183, or "Light Water," and established pricing for sale to the Navy and Ansul.

68.     The following year, 3M and Ansul entered an agreement for testing and finalizing 3M's AFFF formulations for sale to the military and commercial markets.

69.     The companies continued to reformulate Light Water for the military throughout the 1960s, including the development of a seawater compatible foam after a tragic deck fire occurred on the USS Forrestal Aircraft carrier.

70.     In May 2000, 3M announced that it was exiting the perfluorooctanyl chemistry market, at a time when 3M occupied by far the largest market share of AFFF sales to the United States government.

71.     In the 50 years that 3M manufactured and sold PFAS-containing products, including its AFFF, it investigated them extensively, generating hundreds of studies and reports relating to their toxicology, pharmacology, epidemiology, teratology, carcinogenicity, fate, transport and human exposure.

72. These studies repeatedly identified and confirmed the human and environmental risks associated with its PFAS containing products—information that 3M chose not to adequately and timely disclose to appropriate government authorities, including the EPA, despite having a regulatory obligation to do so under the Toxic Substances Control Act ("TSCA"). In the few instances when 3M did provide information to EPA, it did so in an incomplete and misleading manner.

73. 3M's lack of transparency regarding human exposure to PFOS is the cause for the government's ignorance. 3M waited over 20 years, until 1998, to notify the EPA that PFOS had contaminated the globe and could be found in the blood of virtually every man, woman, and child. In an attempt to conceal their actual knowledge of the dangers of PFOS, 3M claimed this discovery to be "a complete surprise" that was only revealed by recent advancements in analytical techniques. But this explanation was untrue.

74. In reality, 3M learned in the summer of 1975 that two independent toxicologists, Drs. Warren Guy and Donald Taves, had discovered the presence of an unidentified organic fluorine compound in human blood from different blood banks.

75. In multiple calls, Drs. Guy and Taves asked 3M if it knew of the "possible sources" of the chemicals they found in the blood of the general population, as Dr. Guy "somewhere […] got the information that 3M's fluorocarbon carboxylic acids are used as surfactants and wanted to know if they were present in 'Scotchgard' or other items in general use by the public."

76. Despite its actual knowledge of the source of the chemicals, 3M chose to "plead ignorance" and instead "adopted a position of scientific curiosity and desire to assist in any way possible ..."

77. That same summer, 3M submitted 10 samples of 3M's PFAS compounds to its

Central Research Analytical Laboratory "in an attempt to identify the material found by [Drs.] Guy and Taves in human blood."

78.     On November 6, 1975, 3M scientist Richard Newmark of the Central Analytical Laboratory authored a report that concluded the fluorine compound discovered "resembled most closely" PFOS—a chemical manufactured only by 3M.

79.     Despite pledging assistance to Drs. Guys and Taves in the characterization of this mystery chemical, 3M declined to share Mr. Newmark's revelation. An internal 3M timeline explained why: "3M lawyers urge [Central Analytical Laboratory] not to release the true identity (PFOS) of the [fluorine] compound."

80.     Then, in 1981, 3M published in the peer-reviewed literature that the mystery chemical observed by Drs. Guy and Taves was not a man-made chemical at all but was instead a naturally occurring substance, a conscious misrepresentation.

81.     In 1979, Defendant 3M discussed its discovery of high levels of PFOS in the blood of its workers and birth defects in children of workers with one of its customers, DuPont. Both companies came to the same conclusion: that there was "no reason" to notify the EPA of the finding.[5]

82.     By the early 1980s, the industry, including Defendant 3M, suspected a correlation between PFAS exposure and human health effects.

83.     Beginning in 1983, 3M documented a trend of increasing levels of PFOS in the bodies of 3M workers. In an internal memo, 3M's medical officer warned, "we must view this

_____

[5]Memorandum from R.A. Prokop to J.D. Lazerte re: Disclosure of Information on Levels of Fluorochemicals in Blood, July 26, 1979, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX2723.pdf. (Last Accessed June 7, 2023)

present trend with serious concern. It is certainly possible that [...] exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."[6]

84.    In 1983, 3M researchers concluded that concerns about PFAS "give rise to concern for environmental safety," including "legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment."[7] That same year, 3M completed 33a study finding that PFOS caused the growth of cancerous tumors in rats.[8] This finding was later shared with DuPont and led them to consider whether "they may be obliged under their policy to call FC-143 a carcinogen in animals."[9]

85.    3M also conducted toxicology studies on rats, mice, and monkeys, which found that "[PFOS] was the most toxic of the three compounds studied and certainly more toxic than anticipated." These studies reported "GI tract toxicity, lipid depletion of adrenals, atrophy of pancreatic exocrine cells and serous alveolar cells of the salivary glands." Indeed, 20 of the 24 rhesus monkeys who participated in this study died as a result of their exposure to PFOS.

86.    By at least the end of the 1980s, additional research and testing performed by Defendant 3M indicated that elevated incidence of certain cancers and other adverse health effects, including elevated liver enzymes and birth defects, had been observed among workers exposed to

---

[6]See Memorandum "Organic Fluorine Levels," August 31, 1984, available at available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades. (Last Accessed June 7, 2023)

[7] 3M Environmental Laboratory (EE & PC), Fate of Fluorochemicals - Phase II, May 20, 1983, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1284.pdf.

[8]Two Year Oral (Diet) Toxicity/Carcinogenicity Study of Fluorochemical FC-143 in Rats, Volume 1 of 4, Aug. 29, 1987, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1337.pdf.

[9]Memorandum from R.G. Perkins to F.D. Griffith re: Summary of the Review of the FC-143 Two-Year Feeder Study Report to be presented at the January 7, 1988 meeting with DuPont, January 5, 1988, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1343.pdf.

such materials, including at least PFOS, but such data was not published, provided to governmental entities as required by law, or otherwise publicly disclosed at the time.

87.     In or around 1998, John Buttenhoff, 3M's chief toxicologist, calculated an internal "safe reference level" of PFOS in human blood.  Although his calculated safe level was thirty times higher than the median level of PFOS found in the blood of the general population, there is no evidence that 3M disclosed this important internal determination to EPA, DoD, or any other regulatory or government agency. At approximately the same time, 3M internally referred to PFOS as "insidiously toxic" and acknowledged that it should be "replaced." Still, 3M continued to produce PFOS.

88.     At all relevant times, Defendant 3M knew, or reasonably should have known, among other things, that: (a) Defendant's PFAS were/is toxic; and (b) when allowed to escape into the open environment per the directions and/or instructions given by the manufacturer, PFOS and PFOA migrate through the subsurface, mix easily with groundwater, resist natural degradation, render drinking water unsafe and/or non-potable, and can be removed from public drinking water supplies only at substantial expense.

89.     At all times pertinent herein, Defendant 3M also knew or should have known that Defendant's PFAS presented/presents a risk to human health and could be absorbed into the lungs and gastrointestinal tract, potentially causing severe damage to the liver, kidneys, and central nervous system, in addition to other toxic effects, and that Defendant's PFAS were/are known carcinogens that cause genetic damage.

90.     Notwithstanding its knowledge of the dangers of PFAS, including both PFOA and PFOS, Defendant negligently and carelessly: (1) developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used Defendant's PFAS; (2)

failed to warn users of Defendant's PFAS about the presence of, and emission of PFOS and PFOA from their products; (3) failed to direct and/or instruct users of Defendant's PFAS on the proper use of and/or disposal of Defendant's PFAS, thus improperly permitting PFOS and/or PFOA to contaminate the soil and groundwater; (4) failed to recall and/or warn users of Defendant's PFAS of the dangers of soil and groundwater contamination as a result of the standard use and disposal of their products; (5) designed products containing or degrading into PFOS and/or PFOA; and (6) failed and refused to issue the appropriate warnings and/or recalls to the users of Defendant's PFAS.

91.     In or about 2012, as a result of litigation against DuPont, a science panel created to conduct studies to confirm which diseases were linked to PFOA exposure, through the first ever large-scale (approximately 80,000 people) epidemiological study of the general population, issued its findings concluding that PFOA exposures among class members were linked to six serious human diseases, including two types of cancer.

C.  **THE IMPACT OF DEFENDANT'S PFAS ON THE DRINKING WATER SUPPLIES OF THE PROPOSED CLASS REPRESENTATIVES AND THE PROPOSED CLASS**

92.     Upon information and belief, the drinking water supplies of the Proposed Class Members have been contaminated and/or threatened to be contaminated with Defendant's PFAS, such that Defendant's PFAS have traveled via surface water, stormwater, groundwater, etc. to contaminate or threaten to contaminate the drinking water supplies of the Proposed Class Members.

93.     The detection and/or presence of Defendant's PFAS and the threat of further detection and/or presence of PFAS in the drinking water supplies of the Proposed Class Representatives and Proposed Class Members has resulted, and will continue to result, in significant injuries and damage to the Proposed Class Representatives and the Proposed Class.

94.     Upon information and belief, the contamination of the water supplies of the Proposed Class Representatives and Proposed Class Members with PFAS is recurring—new contamination flows regularly and constantly through the groundwater each day, resulting in new harm to the drinking water supplies of the Proposed Class Representatives and Proposed Class Members on each occasion.

95.     The injuries to the Proposed Class Representatives and Proposed Class Members caused by Defendant's conduct constitute an unreasonable interference with, and damage to, their drinking water supplies for which they are entitled to any and all damages provided by law.

96.     The detection and/or presence of Defendant's PFAS and the threat of further detection and/or presence of PFAS in the drinking water supplies of the Proposed Class Representatives and Proposed Class Members has resulted, and will continue to result, in significant injuries and damage to the Proposed Class Representatives and the Proposed Class.

97.     Upon information and belief, the contamination of the drinking water supplies of the Proposed Class Representatives and Proposed Class Members with PFAS is recurring—new contamination flows regularly and constantly through the groundwater into the water supplies of the Public Water Systems each day, resulting in new harm to the Proposed Class Representatives and Proposed Class Members on each occasion.

98.     The injuries to the Proposed Class Representatives and Proposed Class Members caused by Defendant's conduct constitute an unreasonable interference with, and damage to, their drinking water supplies for which they are entitled to any and all damages provided by law.

## CLASS ACTION ALLEGATIONS

99.     Defendant's unlawful conduct, as set forth herein, caused Defendant's PFAS to enter into groundwater and surface water sources, ultimately resulting in the contamination of the

drinking water supplies of the Proposed Class Representatives and Proposed Class Members with Defendant's PFAS.

100.    The Proposed Class Representatives did not discover or become aware of the contamination of their ground water before 2025.

101.    The Proposed Class Representatives and Proposed Class Members have suffered and will continue to suffer damages as a result of the presence of Defendant's PFAS in their drinking water supplies.

102.    The Proposed Class Representatives bring this class action on behalf of themselves and all other similarly situated users of drinking water supplied by Public Water Systems.

103.    The proposed Class Members are defined as:

> All natural persons in the United States whose drinking water is
> supplied by a Public Water System.

104.    This action satisfies the ascertainably, numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Federal Rule of Civil Procedure 23.

105.    Ascertainability. The members of the Proposed Class are readily ascertainable without extensive and individualized fact-finding and have been identified as putative Class members by reference to publicly available information.  Class Notice will be delivered to all eligible Public Water Systems customers via direct and publication notice.

106.    Numerosity. The members of the Class are so numerous that their individual joinder is impracticable. According to the U.S. Centers for Disease Control and Prevention nine out of ten Americans use drinking water supplied by Public Water Systems.

107.    Existence and Predominance of Common Questions of Law and Fact. Common questions of law and fact exist as to all Proposed Class Members that predominate over any questions affecting individual class members.  All Proposed Class Members have been subject to

the same unlawful conduct of the Defendant and have suffered the same resulting injuries – contamination of their drinking water supplies. Questions of law or fact which are common to the Proposed Class Members, as set forth in this Complaint, predominate over questions affecting individual members because the Proposed Class Members are similarly situated victims of Defendant's common course of unlawful conduct. Defendant's conduct similarly harmed all Proposed Class Members because Defendant 3M developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used PFAS alone or in end products manufactured with or containing PFAS that infiltrated the Proposed Class Members' drinking water supplies. In addition, Defendant has no defenses specific to individual Class Members, and its defenses, if any, apply equally to all Proposed Class Members. The common legal and factual questions include, but are not limited to, the following:

    a.   When the Defendant designed, manufactured, and sold Defendant's PFAS;

    b.   Whether Defendant owed a duty to the Proposed Class Members to refrain from the conduct that led to the contamination of their drinking water supplies with Defendant's PFAS;

    c.   Whether there is sufficient evidence that Defendant's PFAS posed/poses a risk of harm to the environment and human health;

    d.   Whether Defendant knew and/or should have known that Defendant's PFAS posed/poses a risk of harm to the environment and human health;

    e.   The extent to which Defendant became aware that Defendant's PFAS posed a risk of harm to the environment and human health;

    f.   Whether Defendant provided adequate warnings about the potential harms associated with Defendant's PFAS;

    g.   Whether Defendant provided adequate instructions for the use of Defendant's PFAS;

    h.   Whether Defendant provided adequate instructions for the disposal of waste generated by Defendant's PFAS;

      i.    Whether Defendant made misleading representations or omissions with respect to the environmental and health effects of Defendant's PFAS;

      j.    Whether Defendant's PFAS were defectively and/or negligently designed;

      k.    Whether Defendant owed the Proposed Class Members duties, including a duty to warn about the propensity of Defendant's PFAS to contaminate surface water and groundwater used by Public Water Systems;

      l.    Whether Defendant failed to warn about the environmental and health risks posed by Defendant's PFAS;

      m.    Whether Defendant, through its actions and omissions, breached its duties to the Proposed Class Members;

      n.    whether Defendant, through its actions and omissions, directly and proximately caused the Proposed Class Members' injuries and damages;

      o.    whether Defendant's conduct supports an award of statutory, exemplary and/or punitive damages; and

      p.    whether the Proposed Class Representatives and Proposed Class Members are entitled to damages.

108.    The injuries sustained by the Proposed Class Representative and Proposed Class Members flow, in each instance, from a common nucleus of operative facts – Defendant's misconduct relating to Defendant's PFAS.

109.    These questions of law and fact that are common to the Proposed Class Representatives and Proposed Class Members predominate over any questions affecting them individually.

110.    <u>Typicality</u>. The claims of the Proposed Class Representatives are typical of the claims of the Proposed Class Members in that the Proposed Class Representatives, like the Proposed Class Members, derive drinking water that is contaminated with Defendant's PFAS from a Public Water System.

111.    <u>Adequacy of Representation</u>. The Proposed Class Representatives will fairly and

adequately protect the interests of the Proposed Class Members. The Proposed Class Representatives have retained Proposed Class Counsel all of whom are experienced in highly complex litigation, including litigation involving public entities, widescale environmental damage, class actions and mass torts. Neither the Proposed Class Representatives nor Proposed Class Counsel have any adverse or antagonistic interests to those of the Proposed Class Members, and they will fairly and adequately protect the interests of the Proposed Class Members. Proposed Class Counsel are unaware of any interests adverse or antagonistic to those of the Proposed Class Representatives and the Proposed Class Members.

112.    Superiority. A class action is superior to any other theoretically available method for the fair and efficient adjudication of this controversy.  Significant economies of time, effort, and expense will inure to the benefit of the Court and the parties in litigation of essentially identical issues on a class-wide rather than a repetitive individual basis.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the judicial system and the issues raised by this action. The class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.  No unusual difficulties are likely to be encountered in the management of this class action, and concentrating the litigation in this centrally located forum is particularly convenient to the parties.

## FIRST CAUSE OF ACTION PRIVATE NUISANCE

113.    The Proposed Class Representatives reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

114.    The drinking water supplies of the Proposed Class Representatives and Proposed

Class Members have been contaminated by Defendant's PFAS as a direct and proximate result of the unreasonable acts and omissions of Defendant as set forth herein.

115.    PFAS contamination caused by Defendant's unreasonable acts and/or omissions has substantially damaged the drinking water supplies of the Proposed Class Representatives and Proposed Class Members, and interfered with the ordinary safety, use, benefit, and enjoyment of their drinking water supplies.

116.    At all relevant times, Defendant knew or should have known that Defendant's PFAS would substantially contaminate water supplies and were/are associated with serious illnesses and cancers in humans. Defendant, thus, knew or should have known that PFAS contamination would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of public drinking water supplies.

117.    As a direct and proximate result of Defendant's creation of a private nuisance, the Proposed Class Representatives and Proposed Class Members have suffered, and continue to suffer, monetary damages to be proven at trial.

118.    Defendant's conduct was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, warranting punitive and exemplary damages, because they developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used Defendant's PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries.

### SECOND CAUSE OF ACTION
### STRICT LIABILITY- DESIGN DEFECT
### CONSUMER EXPECTATION TEST

119.    The Proposed Class Representatives reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

120.    The Proposed Class Representatives and Proposed Class Members were harmed by Defendant's PFAS which were developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used by Defendant, and which were dangerous to an extent beyond that contemplated by the ordinary consumer, defectively designed, did not include sufficient instructions, and did not include sufficient warning of potential safety hazards.

121.    The design of Defendant's PFAS was defective because Defendant's PFAS did not perform as safely as an ordinary consumer would have expected them to perform.

122.    Defendant's PFAS did not perform as safely as an ordinary consumer would have expected it to perform when applied, used and/or disposed of as directed, instructed and/or intended and/or when misused in a reasonably foreseeable way.

123.    The drinking water supplies of the Proposed Class Representatives and Proposed Class Members were, are and will continue to be harmed by Defendant's PFAS.

124.    The failure of Defendant's PFAS to perform safely was a substantial factor in causing harm to the drinking water supplies of the Proposed Class Representatives and Proposed Class Members.

125.    Defendant had actual knowledge that Defendant's PFAS were causing the type of harm suffered by the Proposed Class Representatives and Proposed Class Members.

126.    Defendant also knew or should have known that Defendant's PFAS caused harm even when used as intended, instructed, and normally expected and that no third-party could prevent such harm.

127.    Defendant's conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the public drinking water supply, and, thus, Defendant was grossly negligent.

128.     Defendant's conduct was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, warranting punitive and exemplary damages, because they developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used Defendant's PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries.

## THIRD CAUSE OF ACTION
## STRICT LIABILITY - DESIGN DEFECT
## RISK-BENEFIT TEST

129.     The Proposed Class Representatives reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

130.     The Proposed Class Representatives and Proposed Class Members were, are and/or will be harmed by Defendant's PFAS which were developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used by Defendant, and which were defectively designed in that their safety risks outweighed their benefits, if any.

131.     The design of Defendant's PFAS were a substantial factor in causing harm to the Proposed Class Representatives and Proposed Class Members.

132.     The impact of the environmental harm resulting from the use of Defendant's PFAS were, is, and will be enormous because PFAS contamination is widespread, persistent, and toxic.

133.     The likelihood of this harm was, is, and will continue to be very high because Defendant's PFAS were toxic, cannot be contained, and do not readily degrade in the environment.

134.     Defendant knew and/or should have known that Defendant's PFAS were toxic, could not be contained, and do not readily degrade in the environment.

135.     At the time of manufacture, there were alternative safer designs that were feasible, cost effective, and advantageous to Defendant.  For example, Defendant could have developed,

manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used products not containing fluorine for use in AFFF.

136.    Defendant's conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the public drinking water supply, and thus Defendant was grossly negligent.

137.    Defendant's conduct was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, warranting punitive and exemplary damages, because they developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used Defendant's PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries, and that these dangers significantly outweighed any benefits of Defendant's PFAS.

## FOURTH CAUSE OF ACTION
## NEGLIGENCE - DESIGN DEFECT

138.    The Proposed Class Representatives reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

139.    The Proposed Class Representatives and Proposed Class Members were, are and/or will be harmed by Defendant's PFAS which were developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used by Defendant, and which were defectively designed in that they were dangerous to an extent beyond that contemplated by the ordinary consumer, and their risks outweighed their benefits, if any, and they did not include sufficient instructions, and did not include sufficient warning of potential safety hazards.

140.    At all relevant times, Defendant, as commercial developers, manufacturers, formulators, distributors, sellers, transporters, storers, loaders, mixers, appliers sand/or user of Defendant's PFAS, had a duty not to place a defective product into the stream of commerce

meaning that Defendant had a duty not to place into the stream of commerce any product that was unreasonably dangerous.

141.    Defendant breached that duty by developing, manufacturing, formulating, distributing, selling, transporting, storing, loading, mixing, applying and/or using Defendant's PFAS which, at all relevant times, was unreasonably dangerous.

142.    Defendant's PFAS, that were used in the vicinity of the drinking water supplies of the Proposed Class Representatives and/or Proposed Class Members, were defective in design and unreasonably dangerous because, among other things:

      a.   Defendant's PFAS caused and/or would continue to cause extensive and persistent contamination of groundwater when used in its foreseeable and intended manner;

      b.   Contamination with Defendant's PFAS in drinking water poses significant risks to public health and welfare; and

      c.   Defendant failed to conduct and/or disclose adequate scientific studies to evaluate the impact of Defendant's PFAS contamination on the environment and human health.

143.    At all relevant times, Defendant's PFAS were dangerous to an extent beyond that contemplated by the ordinary consumer and posed a foreseeable risk of harm that outweighed the cost to Defendant of measures to mitigate that risk.

144.    Defendant knew or should have known that third parties would purchase Defendant's PFAS and use them without knowledge of their defects and hazardous consequences.

145.    Defendant knew or should have known that at the time of manufacture, that Defendant's PFAS would result in contamination through a chemical that was not biodegradable and bioaccumulated in fish, wildlife, and humans.

146.    Defendant's PFAS were purchased by third parties who used them in a reasonably foreseeable manner and without substantial change in their condition.

147.    Defendant knew or should have known that the use of Defendant's PFAS by these third parties would result in the spillage, discharge, disposal, or release of Defendant's PFAS onto land or into groundwater supplies.

148.    Defendant knew or should have known about safer, feasible alternatives to Defendant's PFAS that could be used in certain end products, such as AFFF, and the omission of those alternative designs rendered Defendant's PFAS defective.

149.    As a direct and proximate result of Defendant's negligence, the Proposed Class Representatives and Proposed Class Members were, are and/or will be harmed by the contamination of their water supplies by Defendant's PFAS.

150.    Upon information and belief, Defendant knew and/or should have known that Defendant's PFAS would result in injury to the Proposed Class Representatives and Proposed Class Members.

151.    Defendant's conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the public drinking water supply, and, thus, Defendant was grossly negligent.

152.    Defendant's conduct was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, warranting punitive and exemplary damages, because they developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used Defendant's PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries.

**FIFTH CAUSE OF ACTION**
**STRICT LIABILITY- FAILURE TO WARN**

153.    The Proposed Class Representatives reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

154.    The Proposed Class Representatives and Proposed Class Members were, are and/or will be harmed by Defendant's PFAS which were developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used by Defendant, and which were designed, manufactured, sold, and distributed without adequate warning of toxicity, potential human health risks, and environmental hazards.

155.    Defendant's PFAS were designed, manufactured, sold, and distributed without instructions to prevent contamination of soil and water and the resulting potential human health risks and environmental hazards.

156.    The potential environmental hazard and toxicity risks of Defendant's PFAS were known and/or knowable in light of the scientific and medical knowledge that was generally accepted in the scientific community and/or in light of Defendant's superior knowledge about Defendant's PFAS at the time of their development, manufacture, formulation, distribution, sale, transportation, storage, loading, mixing, application and/or use.

157.    The potential environmental hazard and toxicity risks presented a substantial danger when Defendant's PFAS were applied, used and/or disposed of as directed, instructed and/or intended and/or when misused in a reasonably foreseeable way.  Ordinary consumers and third-parties would not have recognized the potential risks.

158.    Defendant had strict duties not to develop, manufacture, formulate, distribute, sell, transport, store, load, mix, apply and/or use Defendant's PFAS without adequate warnings of the potential risks associated with Defendant's PFAS, which they knew or should have known resulted from the foreseeable application, use, storage and/or disposal of Defendant's PFAS.

159.    Defendant breached these duties by failing to adequately warn or instruct of the potential risks associated with the application, use and disposal of Defendant's PFAS and the

dangers to drinking water supplies that were contaminated with Defendant's PFAS.

160.    The lack of sufficient instructions or warnings was a direct, proximate and/or substantial factor in causing harm to the drinking water supplies of the Proposed Class Representatives and Proposed Class Members.

161.    Defendant's conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the public drinking water supply, and, thus, Defendant was grossly negligent.

162.    Defendant's conduct was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, warranting punitive and exemplary damages, because they developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used Defendant's PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries, without warning and/or instruction of these dangers.

## SIXTH CAUSE OF ACTION
## NEGLIGENCE - FAILURE TO WARN

163.    The Proposed Class Representatives reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

164.    The Proposed Class Representatives and Proposed Class Members were, are and/or will be harmed by Defendant's PFAS which were developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used by Defendant, and which were designed, manufactured, sold, and distributed without adequate warning of toxicity, potential human health risks, and environmental hazards.

165.    Defendant's PFAS were designed, manufactured, sold, and distributed without instructions to prevent contamination of soil and water and the resulting potential human health risks and environmental hazards.

166.    The potential environmental hazard and toxicity risks of Defendant's PFAS were known and/or knowable in light of the scientific and medical knowledge that was generally accepted in the scientific community and/or in light of Defendant's superior knowledge about Defendant's PFAS at the time of their development, manufacture, formulation, distribution, sale, transportation, storage, loading, mixing, application and/or use.

167.    Defendant had a duty to the Proposed Class Representatives and Proposed Class Members to warn about the potential environmental hazard and toxicity risks associated with Defendant's PFAS.

168.    Defendant breached this duty by failing to adequately warn or instruct of the potential risks associated with Defendant's PFAS.

169.    Defendant had a duty to the Proposed Class Representatives and Proposed Class Members to provide sufficient instructions or warnings relating to Defendant's PFAS to avoid contamination of drinking water supplies of Public Water Systems.

170.    Defendant breached this duty by failing to provide sufficient instructions or warnings relating to Defendant's PFAS to avoid contamination of the drinking water supplies of Public Water Systems.

171.    Defendant's breaches were a substantial factor in causing harm to the drinking water supplies of the Proposed Class Representatives and Proposed Class Members.

172.    Defendant knew or reasonably should have known that users and third parties would not realize the dangers associated with Defendant's PFAS.

173.    Defendant's conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the public drinking water supply, and, thus, Defendant was grossly negligent.

174.    Defendant's conduct was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, warranting punitive and exemplary damages, because they developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used Defendant's PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries, without warning and/or instruction of these dangers.

## SEVENTH CAUSE OF ACTION
## NEGLIGENCE - FAILURE TO RECALL

175.    The Proposed Class Representatives reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

176.    Defendant's PFAS were developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used by Defendant, without adequate warning of toxicity, potential human health risks, and environmental hazards.

177.    Defendant had a duty to use reasonable care to warn or instruct about the risks associated with Defendant's PFAS.

178.    Defendant breached the duty to use reasonable care by failing to warn or instruct about the risks associated with Defendant's PFAS.

179.    Defendant had a duty to recall Defendant's PFAS when it knew or should have known about the risks associated with Defendant's PFAS.

180.    Defendant breached the duty to recall by failing to recall Defendant's PFAS when it first learned or should have learned about the risks associated with Defendant's PFAS.

181.    Defendant knew or reasonably should have known that Defendant's PFAS were dangerous or likely to be dangerous when applied, used and/or disposed of as directed, instructed and/or intended and/or when misused in a reasonably foreseeable way.

182.    At all relevant times, Defendant knew or reasonably should have known that users

and third parties would not realize the danger associated with Defendant's PFAS.

183.    At all relevant times, Defendant knew or reasonably should have known of the human health risks and environmental dangers presented by Defendant's PFAS.

184.    A reasonable developer, manufacturer, formulator, distributor, seller, transporter, storer, loader, mixer, applier and/or user of chemical products under the same or similar circumstances would have recalled Defendant's PFAS.

185.    The Proposed Class Representatives and Proposed Class Members were, are and/or will be harmed by Defendant's PFAS which have contaminated their drinking water supplies.

186.    Defendant's failure to warn and/or recall Defendant's PFAS were a substantial factor in causing the harm suffered by the Proposed Class Representatives and Proposed Class Members.

187.    Defendant's conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the public drinking water supply, and, thus, Defendant was grossly negligent.

188.    Defendant's conduct was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, warranting punitive and exemplary damages, because they developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used Defendant's PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries, without warning and/or instruction of these dangers.

## EIGHTH CAUSE OF ACTION
## TRESPASS

189.    The Proposed Class Representatives reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

190.    The Proposed Class Representatives and Proposed Class Members drink, use and

consume water supplies from Public Water Systems that draw their water from various sources, including groundwater, aquifers and associated pumping, storage, treatment and distribution facilities.

191.    Defendant intentionally, recklessly, and/or negligently caused Defendant's PFAS to enter into the groundwaters, aquifers, and drinking water supplies of the Proposed Class Representatives and Proposed Class Members.

192.    Drinking water supplied by Public Water Systems and contaminated with Defendant's PFAS entered Proposed Class Representatives' and Proposed Class Members' properties.

193.    The Proposed Class Representatives and Proposed Class Members did not give permission for the entry of Defendant's PFAS on to their properties.

194.    The Proposed Class Representatives and Proposed Class Members were, are and/or will be harmed by Defendant's PFAS which have contaminated their drinking water supplies.

195.    Defendant's unlawful conduct was a substantial factor in causing the harm that the Proposed Class Representatives and Proposed Class Members have suffered and/or continue to suffer.

196.    Defendant's conduct relating to Defendant's PFAS lacked any reasonable care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the public drinking water supply, and, thus, Defendant was grossly negligent.

197.    Defendant's conduct in trespassing on the property of the Proposed Class Representatives and Proposed Class Members was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, warranting punitive and exemplary damages, because they

36

developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used Defendant's PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries.

## NINTH CAUSE OF ACTION
## CIVIL CONSPIRACY

198.    The Proposed Class Representatives reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

199.    At all times relevant to this lawsuit, Defendant knew of the hazards that Defendant's PFAS posed to the environment, including the drinking water supplies of the Proposed Class Representatives and Proposed Class Members.

200.    Beginning in the 1940s and continuing through 2002, if not later, Defendant agreed to engage in unlawful and wrongful acts with other PFAS manufacturers and/or customers, including DuPont, that caused damage to the Proposed Class Representatives and Proposed Class Members.

201.    Defendant 3M performed at least one overt act in furtherance of this conspiracy.

202.    Specifically, Defendant colluded with other manufacturers and/or customers, such as DuPont, for the avowed purpose of providing false and/or misleading information about Defendant's PFAS to the public.

203.    The purpose of Defendant's collusion with others was unlawful because its purpose was to: (a) intentionally misrepresent to the public that Defendant's PFAS were safe and did not pose a risk to human health and the environment; (b) to conceal the dangers of Defendant's PFAS, including the products' characteristics and their propensity to contaminate soil and groundwater, from the public by, among other means, repeatedly misrepresenting how Defendant's PFAS were being disposed of; and (c) to conceal the dangers of Defendant's PFAS from the public, including

the Proposed Class Representatives and Proposed Class Members.

204.    As a direct and proximate result of Defendant's conspiracy with others:

(a) Defendant's PFAS posed and continue to pose a threat to the drinking water supplies of the Proposed Class Representatives and Proposed Class Members;

(b) Defendant's PFAS contaminated and will continue to contaminate the drinking water supplies of the Proposed Class Representatives and Proposed Class Members;

(c) Defendant's PFAS contaminated and will continue to contaminate the soil, surface and groundwater on and/or within the vicinity of the drinking water supplies of the Proposed Class Representatives and Proposed Class Members;

(d) Defendant diminished the confidence of the Proposed Class Representatives and Proposed Class Members in their drinking water supplies as well as their use and enjoyment of same;

(e) Defendant diminished the value of the drinking water supplies of the Proposed Class Representatives and Proposed Class Members due to actual, impending, and/or threatened contamination with Defendant's PFAS; and

(f) Defendant caused and/or will cause the Proposed Class Representatives and Proposed Class Members to sustain substantially increased damages and expenses resulting from the loss of the safety, use, benefit and/or enjoyment of their drinking water supplies.

205.    Defendant's conduct in unlawfully conspiring with each other and with others, such as DuPont, to defraud and/or mislead the Proposed Class Representatives and Proposed Class Members was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, warranting punitive and exemplary damages, because they developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used Defendant's PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries.

## PRAYER FOR RELIEF

WHEREFORE, the Proposed Class Representatives, on behalf of themselves and the Proposed Class Members, request that the Court enter an Order or judgment against Defendant, jointly and severally, as follows:

1.    Certification of the action as a Class Action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, and appointment of the Proposed Class Representatives as Class Representatives and the Proposed Counsel as Class Counsel;

2.    Compensatory and/or consequential damages according to proof arising from each cause of action asserted herein;

3.    Exemplary and/or Statutory Damages;

4.    Punitive damages, where available;

5.    Costs, disbursements and attorneys' fees of this lawsuit;

6.    Pre-judgment and post-judgment interest on the monetary relief ; and

7.    Any other and further relief as the Court deems just, proper, and equitable.

## DEMAND FOR JURY TRIAL

The Proposed Class Representatives demand a trial by jury.

Dated: June 3, 2025

Respectfully Submitted,

/s/ Phillip D. Barber
Phillip D. Barber (Fed. ID No. 12816)
**RICHARD A. HARPOOTLIAN, P.A.**
1410 Laurel Street (29201)
Post Office Box 1090
Columbia, SC 29201
(803) 252-4848
(803) 252-4810 (facsimile)
pdb@harpootlianlaw.com

Fletcher Trammell
(*pro hac vice* application forthcoming)

**TRAMMELL PC**
3262 Westheimer, #423
Houston, TX 77098
(800) 405-1740
(800) 532-0992 (facsimile)
fletch@trammellpc.com

Robert W. Cowan
(*pro hac vice* application forthcoming)
**BAILEY COWAN HECKAMAN PLLC**
1360 Post Oak Blvd, Suite 2300
Houston, Texas 77056
Telephone: (713) 425-7100
Facsimile: (713) 425-7101
*rcowan@bchlaw.com*

*Proposed Class Counsel*